CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION
CASE NO. 2:20-CV-5577**

**JOHN GOBLE AND PAULA GOBLE,**
**individually and on behalf of all others**
**similarly situated,**

       **Plaintiffs,**

  **v.**

**TRUMBULL INSURANCE
COMPANY**

       **Defendant.**

**EXPERT REPORT OF HEATHER L. ALBRIGHT**

**May 18, 2023**

Exhibit

**23**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

# Table of Contents

I.  EXPERT BACKGROUND...................................................................................................... 3

II.  SCOPE OF WORK PERFORMED ....................................................................................... 3

III.  BACKGROUND ................................................................................................................... 5

IV.  SUMMARY OF OPINIONS AND OBSERVATIONS ......................................................... 8

V.  LABOR AND OTHER NON-MATERIAL DEPRECIATION ........................................... 14

    A.  Trumbull's process for determining ACV is consistent with fundamental concepts in accounting and tax practices. ............................................................................................................................................15

    B.  All costs used in the manufacturing of inventory and construction of fixed assets become an integral part of an asset's cost basis. .......................................................................................................................................17

    C.  Depreciation used in the calculation of ACV .................................................................................................18

VI.  STRUCTURAL DAMAGE CLAIMS ................................................................................. 19

VII.  OVERVIEW OF EXTRACTED DATA.............................................................................. 23

VIII.  DETAILED FINDINGS AND ANALYSIS ........................................................................ 25

    A.  Plaintiffs' Claim ............................................................................................................................................25

    B.  Johnson's Report ...........................................................................................................................................35

    i.  Mr. Johnson fails to provide a methodology that can be applied to "complex" claims with multiple estimates and/or multiple payments................................................................................................................................41

    ii.  Mr. Johnson also fails to provide a methodology that can be applied to many claims with a single estimate and a single payment.  Further, his example claims are not representative of the Gobles claim or the population of potential class members as a whole. ....................................................................................................................43

    iii.  Mr. Johnson fails to address limitations in the Extracted Data and other claim handling scenarios ...............47

    a.  Limitations of the Extracted Data ................................................................................................................47

    b.  Claims with No Non-Material Depreciation ("RC Up-Front Claims")........................................................50

    c.  Claims Where Estimated Repair Costs Are Overstated ...............................................................................53

IX.  CONCLUSION .................................................................................................................... 54

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## I. EXPERT BACKGROUND

1. I am a Managing Director with Stout Risius Ross, LLC ("Stout"), a global investment bank and advisory firm specializing in corporate finance, valuation, financial disputes, and investigations. I am a Certified Fraud Examiner ("CFE") and a member of the Association of Certified Fraud Examiners, with an educational background in finance and accounting. My business address is One South Wacker, Suite 3800, Chicago, IL 60606. **Exhibit 1** is a copy of my current curriculum vitae listing my work experience, academic degrees, and publications. **Exhibit 1** also lists the matters in which I have previously testified.

2. For the past 20 years, my practice has involved consulting with clients regarding financial and accounting matters primarily in litigation, in anticipation of litigation, or during investigations. I have testified as an expert witness on damages, class action matters and other measures of loss. My opinions as expressed in this report are based on my training and experience, my understanding of depreciation concepts, my review and knowledge of authoritative accounting and tax literature, my experience in forensic accounting and data analysis, my prior experience working on other labor depreciation cases, as well as on my review of the materials referenced in this report. My experience on labor depreciation cases has included the review of approximately 1,500 structural property claims. I also have experience working with the underlying data that can be extracted from the Xactimate® estimating software and claims management software.

3. Stout is compensated at the hourly rate of $495 for my services in connection with this matter. Additionally, fees and expenses related to this engagement are billed by Stout based on hourly rates and actual out-of-pocket expenses incurred. I was assisted by additional Stout professionals working under my direction. No portion of my firm's compensation is dependent on the nature of my opinions or on the outcome of this matter.

## II. SCOPE OF WORK PERFORMED

4. The law firm of Carpenter Lipps LLP retained me on behalf of Trumbull Insurance Company ("Trumbull" or "Defendant") in connection with the lawsuit brought against Trumbull by John and Paula Goble ("the Gobles" or "Plaintiffs"). I prepared this report pursuant to my

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

engagement as an expert in connection with the litigation. For this engagement, I was asked to:

   i.    Explain the application of depreciation in accounting and other similar contexts;

   ii.    Provide a summary and explanation of my review and analysis of Plaintiffs' claim file with a focus on determining how the claim was evaluated and paid, the claim file records needed to make that determination, and the time required to make that determination;

   iii.    Determine whether the two primary data sets produced in this matter at Plaintiffs' request, which were extracted from (1) Xactware data, and, separately, from (2) Trumbull's claims management software, can be used to accurately and systematically determine how each claim was paid and which claim payments, if any, had non-material depreciation applied;

   iv.    Address, as relevant to my opinions, the views and opinions expressed by Mr. Toby Johnson in his report submitted on March 10, 2023 (the "Johnson Report"); including assessing whether the methods and data utilized by Mr. Johnson is his expert report can be utilized to accurately and systematically identify persons who meet Plaintiffs' proposed class definition, and/or who are similarly situated to Plaintiffs.

5.    As it relates to these issues, I understand that Trumbull contends in this case that its payment obligation for a covered loss, whether for actual cash value ("ACV") or replacement cost benefits ("RC" or "RCBs"), is capped at the insured's actual cost to repair the damaged property.[1]

6.    The following narrative report summarizes my current opinions on this matter. I have no opinion regarding the legitimacy of the legal claims made by Plaintiffs and that is not a factor considered in my opinions. References to documents in this narrative report are meant to provide examples of supporting information but are not intended to be comprehensive or exhaustive lists of all known or potential support. Further, the information in this report is

---

[1] "Upon receipt of the documentation as outlined above, we will pay you the initially withheld depreciation amount or the actual cost of repairs less the initial payment, deductible, and salvage – whichever is less." TRUMBULL-GOBLE #000415-#000417 at #000416. Also, TRUMBULL-GOBLE #000001-#000062 at #000026-#000027.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

based on information available to me at this time. A list of documents which I considered in forming my opinions is provided in **Exhibit 2**.

7.  The analyses and opinions described herein are subject to revision or supplementation should further information be produced during the course of discovery. In addition, I may respond to any testimony or reports that any proposed expert(s) for the Plaintiffs may provide that are filed concurrently with, or that post-date, this report.

8.  I hold the opinions expressed in this report to a reasonable degree of certainty based on my experience as an expert in finance, accounting and data analysis.

## III.   BACKGROUND

9.  I understand that Trumbull, a subsidiary of Hartford Financial Services Group, Inc., is a national insurance company that offers property insurance coverage in multiple states, including Arizona, Connecticut, Illinois, Kentucky, Maryland, Mississippi, Ohio, Tennessee, Utah, Vermont, Virginia, and Wisconsin (the particular states at issue in Plaintiffs' lawsuit).[2]

10. Based on my review of the amended complaint, Plaintiffs, who reside in Ohio, filed the First Amended Class Action Complaint on October 29, 2021 (the "First Amended Complaint"), alleging that Trumbull underpaid certain structural damage insurance claims. Specifically, Plaintiffs claim that when making ACV payments, Trumbull should not have depreciated labor and other non-material costs associated with the estimated cost to repair or replace the damaged property or portion thereof.[3]

11. Based on my review of Plaintiffs' homeowners insurance policy, I understand that Trumbull's policies contain a loss settlement provision that addresses what Trumbull will pay for covered structural damage to insured property.[4] I also understand that under certain policies like the Gobles, Trumbull may settle structural damage insurance claims in two steps as outlined in its policies. First, before the insured undertakes repairs, Trumbull generally prepares an estimate of the cost to repair or replace the damaged property (referred to as the

---

[2] First Amended Complaint, ¶ 7 and https://www.thehartford.com/aarp/homeowners-insurance.
[3] First Amended Complaint, ¶¶ 24-27.
[4] TRUMBULL-GOBLE #000001-#000062 at #000026-#000027.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

estimated replacement cost value or "RCV") and adjusts that estimate (to account for the decrease in value of the damaged property due to its age, condition, or both) by subtracting depreciation from the estimated replacement cost value.[5] The amount that results from the calculation of RCV less depreciation is known as actual cash value or ACV.[6]

12. The ACV, like the RCV, is an estimate. The actual replacement cost for any component of a damaged structure cannot be known before the insured undertakes repairs, or obtains a contract for the repairs. In the event the Trumbull adjuster deems it appropriate to make a payment based on the prepared estimate, Trumbull for certain time periods, policies, and states, then generally issues an initial payment for the ACV less the insured's deductible, subject to the other terms and conditions of the policy.[7] Thereafter, if policyholders undertake repairs, they may choose to seek payment for any additional amounts needed to complete the repairs that exceed the amount of the ACV payment.[8] Policyholders may request additional payments (which I will refer to as "RC" payments) by submitting documentation to Trumbull that shows their actual cost to repair, such as signed contracts, or contractor invoices and receipts showing that repairs are contracted to be performed, are in progress, or have been completed.[9] Trumbull may then issue a RC payment (or payments).[10] I have been informed by counsel that Plaintiffs do not challenge the notion that a policyholder is subject to a two-step ACV and RC process for the policies in question, but rather challenge the calculation of ACV payments.

13. Plaintiffs allege that Trumbull understated the ACV of their loss and those of the proposed class members, and thus underpaid both them and the alleged class members. Specifically, Plaintiffs believe that the cost of labor and other non-materials included in the estimated

---

[5] TRUMBULL-GOBLE #000415-#000417 at #000416.

[6] TRUMBULL-GOBLE #000415-#000417 at #000417 and Deposition of Sean Grinnan, dated December 1, 2022, p. 83:8-9.

[7] Gobles' Trumbull Homeowners Policy No. 55- RBD944752 effective April 4, 2019 to April 4, 2020 (#000001-#000062).

[8] TRUMBULL-GOBLE #000415-#000417 at #000417.

[9] "The terms of your replacement cost coverage require that you notify us of your intent to repair, replace or rebuild the property within a reasonable period (*reasonable period is defined as 180 days after the date of loss, unless otherwise specified in your policy*). If you have a signed, executed contract for the repairs, please send us a copy; or upon completing the repairs or replacing the property you will need to send us your itemized receipts or invoices." TRUMBULL-GOBLE #000415-#000417 at #000417.

[10] TRUMBULL-GOBLE #000415-#000417 at #000417.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

RCV should not be depreciated when Trumbull calculates ACV.[11] Plaintiffs agree that the cost of materials included in the estimated RCV should be depreciated when determining the ACV.[12]

14. Plaintiffs have defined the alleged class as follows:

> All Trumbull policyholders (or their lawful assignees) who made: (1) a structural damage claim for property located in Arizona, Connecticut, Illinois, Kentucky, Maryland, Mississippi, Ohio, Tennessee, Utah, Vermont, Virginia and Wisconsin; and (2) for which Trumbull itself accepted coverage and then chose to calculate actual cash value exclusively pursuant to the replacement cost less depreciation methodology and not any other methodology, such as fair market value; and (3) which resulted in an actual cash value payment during the class period from which non-material depreciation was withheld from the policyholder; or which should have resulted in an actual cash value payment but for the withholding of non-material depreciation causing the loss to drop below the applicable deductible, for the maximum limitations period as may be allowed by law and arguments of counsel.

> In this definition, "non-material depreciation" means application of either the "depreciate removal," "depreciate non-material" and/or "depreciate O&P" option settings within Xactimate® software or similar depreciation option settings in competing commercial software programs.

> The class excludes any claims for which the applicable limits of insurance have been exhausted by initial actual cash value payments.

> The class also excludes any claims arising under labor depreciation permissive policy forms, *i.e.*, those forms and endorsements expressly permitting the "depreciation" of "labor" within the text of the policy form, unless the use of those forms violate the law of the respective states at issue.[13]

---

[11] First Amended Complaint, ¶¶ 10, 18, 30.
[12] *Id.*, ¶ 29.
[13] *Id.*, ¶ 34.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

15. The Plaintiffs' Motion for Class Certification dated March 10, 2023 included a list of 992 claims, according to Plaintiffs, which represent the "minimum portion of the putative class members."[14] Notably, based on my review of the 992 claims, the Gobles' claim was not found on this list of potential class members supplied by Plaintiffs.

## IV. SUMMARY OF OPINIONS AND OBSERVATIONS

16. It is well-established in accounting and tax literature that the cost basis of a structure, such as a home, includes all material, labor and other non-material costs incurred to acquire or construct the structure and make it ready for use. With the passage of time, the entire cost basis is depreciated because the entire structure is subject to wear and tear and a decline in value. These accounting and tax principles are conceptually consistent with the cost approach that is used in the appraisal industry and in the property insurance context, where value is determined by estimating a replacement cost value and applying depreciation to that value.

17. Based on my review of relevant data and documents produced in this matter, and my previous experience reviewing structural property claim files, ████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

---

[14] Plaintiffs' Motion for Class Certification, p. 45.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
█████████████████

18. ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████

19. Based on my review of relevant data and documents produced in this matter, and my previous experience reviewing structural property claim files and underlying data extracted from the Xactimate® software and claims management software, ██████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

---

[15] Plaintiffs' Motion for Class Certification, p. 46.
[16] Consistent with Plaintiffs' proposed class definition, my use of the term "non-material depreciation" includes non-material depreciation, general contractor overhead & profit depreciation, and removal depreciation. First Amended Complaint, ¶26.

EXPERT REPORT OF HEATHER L. ALBRIGHT - 9

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

20.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

███████████████████████████████████████████████████████
███

21. Mr. Johnson also claims that he can determine the amount of non-material depreciation that was "withheld" from a payment and the timing of the withholding in 2-3 minutes per claim if he had the "current and workable" Xactimate® file and access to Trumbull's claims management software.[18] ████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
█████[19]█████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████████████████████████████████ Based on my general professional experience reviewing over 1,500 structural property claims, and the data that can be extracted from Xactimate® software and claims management software in this matter, this is not the case. Johnson glosses over these types of issues by referring vaguely to "more complex claims" that will "require more time."[20] Mr. Johnson did not provide an approach to evaluate claims where there are multiple payments and/or where the payments do not reconcile to the Xactimate® estimate and therefore the estimate (and .ESX file) do not reflect what was paid to the policyholder and what items were paid on an ACV versus an actual repair cost basis.

22. Trumbull's determination of estimated replacement cost and actual cash value for purposes of adjusting a property damage claim typically involves the use of the Xactimate® estimating software, an Xactware product,[21] which estimates repair and replacement costs. Estimates prepared using the Xactimate® software do not necessarily reflect the actual cost to repair or replace the damaged property. The actual repair costs in my experience may differ substantially (either higher or lower) than the estimated repair costs. That is, some

---

[18] Johnson Report, ¶¶ 7, 52, and 54.
[19] Johnson Report, ¶¶ 42, 46, and 55.
[20] Johnson Report, ¶ 56.
[21] Verisk is the company that owns and licenses Xactware products and the Xactimate® software. https://www.verisk.com/insurance/products/Xactimate®/

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

insureds spend *more* money repairing their damaged property than the insurance adjuster originally estimated (and receive payment for that additional cost to the extent reasonable and necessary). On the other hand, some insureds spend *less* money repairing their damaged property than the insurance adjuster originally estimated, sometimes even being able to repair their damaged property for less than the estimated ACV amount that they were paid. In those latter instances, the insureds' ACV may be sufficient not only to pay for the damaged portion of the property in its pre-loss depreciated condition, but also to pay for the damaged portion of the property in new condition.

23. ███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████

24. Based upon my experience reviewing structural property claims, every insurance claim is unique. There are several individualized issues that must be accounted for in order to determine whether non-material depreciation was withheld from a proposed class member for any period of time.

    i. Even if an estimate prepared using the Xactimate® software calculated non-material depreciation, that is not always indicative of whether or not such non-material depreciation was withheld from the insured in a payment. ███████████
███████████████████████████████████████████
███████████████████████████████████████████
█████████████████████████████

    ii. ███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████

iii. In some instances, in my experience, contractors will agree to perform the work for the amount in an initial ACV payment, without regard to whether such payments include depreciation for non-material costs or not. In such instances, the depreciation of non-material costs has no effect on the insured's ability to have their property repaired or replaced. ████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████ In my experience, the actual repair costs can be less than the estimated repair costs calculated using the Xactimate® software. In these situations, whether or not an insured had non-material depreciation withheld may be irrelevant because the insureds may have received more than the actual costs to repair or replace their property and may have been paid in excess of their actual repair costs. Because Trumbull does not routinely require evidence of completion of repairs from its insured, it is difficult to determine whether insureds may have actually been economically harmed by the withholding of any non-material depreciation, because Trumbull does not possess records regarding repairs unless they are provided voluntarily by the insured.

iv. In other instances, Trumbull may elect to pay RC benefits even before proof of completion of the work has been provided, instead agreeing to pay RC amounts upon the receipt of a signed contract between the insured and a contractor to perform the repairs. In those cases, it is possible that the insured receives the RC payment, but never has the work performed. In these instances, I understand that Trumbull's position is that insured may have been overpaid in comparison to the express terms of the contract, and potential recovery for allegedly withheld non-material depreciation may be subject to offset. Notably, based upon the deposition testimony of the Gobles themselves, the Gobles fall into this category, having received full RC

benefits on their insurance claim, but admitting that they have yet to have the contracted work performed on their windows.[22]

    v.    In some instances, Trumbull may issue payments for full RC costs just days or weeks after the initial ACV payment in which such labor was withheld. For example, in my review of the Gobles' claim file I found that they were in possession of an ACV payment for less than thirty days before receiving full RCBs. Mr. Johnson did not indicate whether his calculation of interest would consider applicable state laws and regulations regarding the required timing by which insurance companies have to fully pay on a settled claim.

## V.    LABOR AND OTHER NON-MATERIAL DEPRECIATION

25.    Contrary to Mr. Johnson's assertions in paragraph 30 of his report regarding the use of depreciation in the property insurance industry, depreciation is a fundamental accounting and tax principle that accounts for the decline in value of a fixed asset,[23] such as a home or structure, over time due to wear and tear and/or functional obsolescence. Depreciation is calculated based on the fixed asset's cost basis and its useful life (e.g. its estimated lifespan). A fixed asset's cost basis comprises *all* costs incurred to acquire or construct the asset and make it ready for use, known as "capitalized costs," including the cost of materials, labor, tools, machinery and equipment, taxes, and profit.[24] The decline in value (i.e. depreciation) of a fixed asset is represented by subtracting a portion of the cost basis of the asset. Thus, all costs incurred to acquire or construct the home or structure – including materials and labor – are depreciated.

26.    Appraisers also take depreciation into account when valuing a property.[25] In the cost approach, an appraiser first estimates the total current costs to construct a replacement of an existing structure, which includes labor and other non-material costs. The replacement cost

---

[22] Deposition of John Goble dated September 3, 2021, p. 63:12-13 and Deposition of Paula Goble, dated September 18, 2021, p. 40:12-13 and pp.67:17-68:7.
[23] A fixed asset is a long-term tangible piece of property that is not expected to be consumed or converted into cash in less than one year's time.
[24] "All costs necessary to acquire the asset and make it ready for use are included in the asset account. Costs included in the asset account are called **capitalized costs.** (Expenditures excluded from asset categories are 'charged-off' to income-that is, expensed.)" *See* Revsine, Collins, and Johnson. *Financial Reporting and Analysis 3rd Edition.* Chapter 10. Pearson Education, Inc., 2005.
[25] "Chapter 27: The Cost Approach." *The Appraisal of Real Estate, 14th Edition.* Illinois: The Appraisal Institute 2013.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

estimate is reduced by depreciation to adjust for the loss in value caused by the age, condition, and utility of the structure. The authoritative appraisal reference material I reviewed shows that, as in the accounting context, an appraiser using the cost approach does not exclude or remove labor or any other non-material costs from the cost basis of a structure before applying depreciation.

27. Accounting, tax, and appraisal principles recognize that applying depreciation to material, labor, and other non-material components yields an approximation of a property's value. In my professional and academic experience, as well as my knowledge and review of accounting and tax literature, I have not encountered anything to support the removal of labor or other non-material capitalized costs from the cost basis of a fixed asset when applying depreciation. Based on my review of Trumbull data and documents produced in this matter, the process Trumbull uses for the claims Plaintiffs are challenging parallels the process used in the accounting, tax, and appraisal fields.

### A. Trumbull's process for determining ACV is consistent with fundamental concepts in accounting and tax practices.

28. Plaintiffs have asserted that "labor", which includes references to labor costs, laborers' equipment costs, contractors/laborers' overhead and profit, and removal costs, "does not depreciate in value over time."[26] This is contrary to what is found in accounting-related literature, cost accounting standards, generally accepted accounting principles, the Internal Revenue Code,[27] and the Code of Federal Regulations, which all present the capitalization of labor and other non-material costs as a fundamental concept.[28] These sources consistently

---

[26] First Amended Complaint, ¶¶ 24 and 26.

[27] The Internal Revenue Service (the "IRS") recognizes that property is subject to wear and tear and allows individuals to take tax deductions for the depreciation of property that is a place of business or produces income. The Internal Revenue Code clearly lays out that the cost basis of a home includes labor and other non-material costs along with fees and taxes, which are all subject to depreciation.

Internal Revenue Service – U.S. Internal Revenue Code: Tax Standards 26 U.S. Code § 167 – Depreciation, which states that "[t]here shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) – (1) of property used in the trade or business, or (2) of property held for the production of income."; Internal Revenue Service - U.S Internal Revenue Code: Publication 527 – Residential Rental Property; Internal Revenue Service - U.S Internal Revenue Code: Publication 587 – Business Use of Your Home; Internal Revenue Services - U.S Internal Revenue Code: Publication 551 – Basis of Assets.

[28] *See* Financial Accounting Standards Board - Accounting Standards Codification: ASC 330-10 Inventory; ASC 360-10 Property, Plant and Equipment; 26 U.S. Code § 263A; and Code of Federal Regulations (CFR) – Title 48: Federal Acquisition Regulations System, Part 9904 – Cost Accounting Standards.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

hold that all costs incurred in the production of inventory and the construction of fixed assets, including labor and other non-material costs, are to be capitalized, becoming part of the asset's cost basis, and are subject to depreciation. For example, the cost of a building includes all expenditures related to its acquisition or construction, including the materials, labor, and overhead costs incurred during construction as well as professional fees and building permits.[29]

29. Accounting and tax literature clearly lay out that nearly all fixed assets decrease in value due to wear and tear.[30] Fixed assets are described in accounting textbooks as having a quantity of usefulness, or a useful life.[31] The daily existence of a structure, such as a roof, and its exposure to the elements, causes a portion of its quantity of usefulness to be consumed and eventually the structure will need to be replaced. Accounting literature makes no distinction between the consumption of labor versus materials or any other inputs included in an asset's cost basis – the asset as a whole is subject to depreciation and at some point will have zero or near-zero value. When a roof needs to be replaced, all costs incurred in the prior construction will need to be incurred again since the roof does not forever retain the value of the cost of labor (or any other input) originally used in construction. The contractor hired to repair or replace the roof will not provide the homeowner a "credit" for the labor and other non-material costs previously incurred to build that structure.

30. Trumbull's process for determining ACV when handling structural damage claims parallels the depreciation approach used in accounting and tax disciplines. Adjusters include labor and other non-material costs in the estimated replacement value of damaged property and apply depreciation, if appropriate, to that value, via their observations on the age and condition of the property, and accompanying Xactimate® calculations of depreciation based on inputs from those observations.

---

[29] Kieso, Weygandt, and Warfield. *Intermediate Accounting 13th Edition.* Chapter 10. John Wiley & Sons, 2010.

[30] One exception is land because it is a limited resource with an unlimited life. However, land used for its natural resources such as oil and minerals is subject to depletion, which is very similar to the concept of depreciation.

[31] Pyle, William W. and John Arch White. *Fundamental Accounting Principles, 7th Edition.* Illinois: Irwin, 1975. Kieso, Weygandt, and Warfield. *Intermediate Accounting 13th Edition.* Chapter 11. John Wiley & Sons, 2010.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**B.** *All costs used in the manufacturing of inventory and construction of fixed assets become an integral part of an asset's cost basis.*

31. The construction of fixed assets and the manufacturing of inventory involves using inputs of labor, tools, equipment, and machinery, to convert raw materials into products. The inputs then lose their separate identities, becoming fungible and integrated into the overall product.[32] The cost basis of a material used for the construction of a home would include labor costs that were incurred in the manufacturing of that material. For example, a manufacturer of wood roofing shingles includes the cost of timber (raw material), workers' wages and benefits (labor), as well as the cost of the tools, equipment, and machinery used to construct the shingles in the overall cost of inventory. Once the shingles are sold to a third party, such as a homebuilder, they become a material cost for the homebuilder.[33] A homebuilder uses a variety of materials along with direct labor, tools, equipment, and machinery to construct a home. A builder's home inventory becomes a fixed asset once purchased by a homebuyer and the purchase price becomes the cost basis for the homebuyer.[34] Below is an illustration of this point:

---

[32] "Materials are purchased, wages and salaries are paid, and repair costs are incurred in specific and easily identifiable transactions. But once production begins, these costs must be transferred to Work in Process accounts so that they will reflect the combining of materials and services during processing." Chatfield, Michael and Dennis Neilson. "Chapter 3: Cost Allocation." *Cost Accounting*. Harcourt Brace Jovanovich, Inc., 1983.

[33] This would include the manufacturer's inventory cost plus profit and likely other costs such as sales tax.

[34] "As direct materials, direct labor, and overhead are introduced into the production process, they become part of the work in process inventory value. When the home is completed, the accumulated costs become part of the finished goods inventory value" Mitchell Franklin, Patty Graybeal, and Dixon Cooper. "Chapter 4: Job Order Costing." *Principles of Accounting, Volume 2: Managerial Accounting*. XanEdu Publishing Inc., 2019.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



32. A shingle is a finished product to a shingle manufacturer just as a mobile home is a finished product to a manufacturer of mobile homes. Both of these assets would not exist if there had not been material inputs and labor and other non-material inputs used to manufacture them. In an accounting context, the cost for all of these inputs are included in the asset's costs basis and the entire asset is subject to depreciation. Plaintiffs are not disputing that material costs are subject to depreciation, and those costs would include the cost of labor necessary to construct that material.

### C. Depreciation used in the calculation of ACV

33. Mr. Johnson states that an ACV payment that depreciates certain non-material costs is "[w]ithholding estimated future labor costs."[35] Depreciation applied in calculating an ACV payment does not withhold future labor costs, just as it does not withhold future material costs. The depreciation used for the calculation of an ACV payment is applied to an estimate of the current replacement cost in order to determine the pre-loss value of an existing structure based on its age and condition prior to the loss. That is, material and labor depreciation accounts for the depreciation of the existing structure, before repair or replacement; actual cash value is just used as a means to approximate the value of the existing structure immediately prior to loss. An insured that intends to have repair work

---

[35] Johnson Report, ¶ 28.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

performed and appropriately documents as such is not "deprived" of the monies needed to perform repairs, as Mr. Johnson suggests in his report.[36]

34. Further, while Mr. Johnson states that the Xactimate® software has setting functions to exclude the application of depreciation to non-material components of replacement cost estimates,[37] that is not a basis for concluding that changing the setting functions in that manner results in an appropriate measure of the pre-loss value of an aged structure.

35. As I have explained, the cost basis of a structure includes more than the cost of materials, in that labor and other non-material costs are required to assemble materials used in building the structure. As set forth in the authoritative literature and based on my experience, applying depreciation to non-material costs included as part of the property's cost basis is a proper and accepted practice in the accounting, tax, and appraisal fields, and there is no reason why it also would not result in an accurate approximation of the depreciated value of property in the property insurance context.

## VI.   STRUCTURAL DAMAGE CLAIMS

36. I understand that the dispute in this case involves the loss settlement provision of the homeowners insurance policy issued to Plaintiffs and other Trumbull insureds. The loss settlement provision for structural losses in Plaintiffs' homeowners policy, in what I have been asked to assume is the pertinent part, states the following in explaining how Trumbull will pay structural damage claims:[38]

**C. Loss Settlement**
…Covered property losses are settled as follows:
    1.  Property of the following types:
        a. Personal property;
        b. Awnings, carpeting, household appliances, outdoor antennas and outdoor equipment, whether or not
        attached to buildings;
        c. Structures that are not buildings; and
        d. Grave markers, including mausoleums;
    at actual cash value at the time of loss but not more than the amount required to repair or replace.

---

[36] *Id.*, ¶ 32.
[37] *Id.*, ¶¶ 27-30.
[38] TRUMBULL-GOBLE #000001-#000062 at #000026-#000027.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2. Buildings covered under Coverage A or B at replacement cost without deduction for depreciation, subject to the following:

a. lf, at the time of loss, the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss, we will pay the cost to repair or replace, after application of any deductible and without deduction for depreciation, but not more than the least of the following amounts:

(1) The limit of liability under this policy that applies to the building;
(2) The replacement cost of that part of the building damaged with material of like kind and quality and for like use; or
(3) The necessary amount actually spent to repair or replace the damaged building.

…

d. We will pay no more than the actual cash value of the damage until actual repair or replacement is complete. Once actual repair or replacement is complete, we will settle the loss as noted in 2.a. and b. above.
However, if the cost to repair or replace the damage is both:

(1) Less than 5% of the amount of insurance in this policy on the building; and
(2) Less than $2,500;

we will settle the loss as noted in 2.a. and b. above whether or not actual repair or replacement is complete.

e. You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss to buildings on an actual cash value basis. You may then make claim for any additional liability according to the provisions of this Condition C. Loss Settlement, provided you notify us of your intent to do so within 180 days after the date of loss.

37. From my review of the Plaintiffs' claim file and the claim files that I have reviewed in other matters, I have observed that insurers like Trumbull frequently adjust policyholders' structural damage claims by estimating the cost to repair and/or replace the damaged property and then applying depreciation to estimate the pre-loss value of that property. For the matters I have been involved in, this adjustment process typically involves the use of the Xactimate® estimating software. The Xactimate® software applies unit prices (which often comprise both material and labor components) for the specific geographic area (as provided by Xactware)[39] to estimated quantities (e.g. number of units, labor hours, square feet, linear feet, etc.) that the adjuster enters into Xactimate® based on a physical inspection of the

---

[39] Verisk is the company that owns and licenses Xactware products and the Xactimate® software. The pricing by Verisk is based on "cost information based on actual prices and transactions (completed bids) that have occurred recently in your area." https://www.verisk.com/insurance/products/pricing-data-services/ (downloaded on 5/8/2023).

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

damaged property and conversations with the policyholder and/or their contractor (if they are present or otherwise provide relevant information). The Xactimate® software also applies general contractor overhead and profit if the adjuster thinks the repairs are complex enough to warrant this expense, and applicable sales tax.

38. Based on my experience, the Xactimate® software calculates depreciation for some tasks based on the adjuster's input as to the age and condition of the different components of the property. Thus, the application of depreciation on an estimate prepared using Xactimate® may vary from task to task. For example, if the adjuster inputs information that a roof of average condition with 30-year shingles is 10 years old, the Xactimate® software applies a 33% depreciation rate (10 years/30 years) to the roofing line item for which the depreciation was identified as necessary by the adjuster. In the same estimate, if the roof vent was recently installed, the adjuster may not apply any depreciation to the vent. Note that whether an estimate prepared using Xactimate® applies depreciation is a separate question and issue than whether depreciation was or was not applied to a claim payment.

39. I have observed in my review of claim files that adjusters sometimes do not make an initial ACV payment based on an Xactimate® estimate, but rather make an up-front replacement cost payment for the full amount the insured has incurred or has contracted to pay for repair or replacement of their damaged property, with no deduction for depreciation. This payment can be made after the adjuster has prepared an Xactimate® estimate that reflects the replacement cost estimate and application of depreciation as they have deemed appropriate, which can be different from the full amount of the replacement cost paid up-front. I discuss such claims in more detail starting on page 50 of this report. Further, in some claims an adjuster may prepare an Xactimate® estimate where the resulting ACV payment amount exceeds the applicable policy limit. In these situations, the policyholder holder will typically receive payment only up to the applicable policy limit. In other instances, the adjuster may issue a payment upon receipt of a signed contract between the insured and a contractor to perform the work, even before the work has been performed. Such payments would not necessarily be tied to or related to an estimate found in Xactimate®.

40. For claims where the full replacement cost or applicable policy limit is not paid up-front, the initial payment made to the policyholder may be an ACV payment equal to the total

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

estimated replacement cost less depreciation and less the policy's deductible. As more information becomes available about the potential costs that may be incurred to complete repairs or replacement, the adjuster may update the Xactimate® estimate to reflect the new information. Such information could include, for example, an estimate provided by the insured's contractor or findings from an additional inspection of the property. When such updates are made, the policyholder may receive one or more additional payment(s).

41. For claims in which the policyholder first receives an ACV payment, the policyholder may later recover supplemental payments for actual repair or replacement cost. Based on my review, the RC payments do not "repay" depreciation previously applied, but rather cover the insured's additional costs incurred to complete repairs above their initial ACV payment(s), (less deductible). This amount can be less than, equal to, or more than the amount of depreciation originally applied in calculating the ACV payment. Additional inputs from contractors may support a reduction in the total estimated cost to repair property, such as where an insured has retained a contractor who charges less for repairs than the replacement cost estimate generated from the adjuster's use of Xactimate®. When this happens, it is clear that the initial Xactimate®  estimate overstated the RCV and accordingly, overstated the calculated ACV of the damaged property.

42. I have observed that the policyholders may not pay out-of-pocket for the repair or replacement costs. For example, based on my review of the claim file, I understand that Trumbull sent the Gobles a check for RC payments when documentation was provided showing the repairs were contracted to be performed. Such payments for replacement costs are often made before the repairs are completed and/or before the policyholder has paid out-of-pocket for any repairs (aside from a deductible). In these instances, policyholders may have received a RC payment for repairs that were not completed. Without an inspection of the property after the repairs were completed and/or a discussion with the policyholder and their contractor to determine what repairs were done, Trumbull cannot be certain the repair costs that were paid were used for the intended purpose.

43. ████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



44. For claims where payments were endorsed directly to the contractor, or where the payments were made to the policyholder before the amount was due to the contractor, the policyholder would be in the same economic position whether or not Trumbull depreciated non-material costs when making a payment based on the estimated ACV. Identifying these types of claims will require an individual review of each claim file. Mr. Johnson did not indicate in his report that his methodology would consider the foregoing policyholders, short of doing a manual review of each claim file █████████████████████████████████████████ ████████████.

## VII.  OVERVIEW OF EXTRACTED DATA

45. ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████ ██ ████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████ ██

- CLAIM_NUMBER ("Claim Number")
- DATE_OF_LOSS ("Date of Loss")
- ESTIMATE_COUNT
- ESTIMATE_DATE

---

40 Plaintiffs' Motion for Class Certification, p. 18
41 ██████████████████████████████████████

- RCV
- ACV
- NET_CASH_VALUE ("Net Cash Value")
- TOTAL_DEPRECIATION ("Total Depr")
- TOTAL_NON_MATERIAL_DEPR ("Total Non-Material Depr")
- TOTAL_SALES_TAX_DEPR ("Total Sales Tax Depr")
- TOTAL_GCOP_DEPRECIATION ("Total GCOP Depr")
- TOTAL_REMOVAL_DEPR ("Total Removal Depr")
- STRUCTURAL_POLICY_LIMIT
- STRUCTURAL_DEDUCTIBLE
- OTHER_STRUCTURES_POLICY_LIMIT
- OTHER_STRUCTURES_DEDUCTIBLE

46.  

- LOSS_EVNT_NUM ("Claim Number")
- LOSS_LOC_ST_ABBR ("State")
- LOSS_DT ("Date of Loss")
- PUB_ADJUSTER ("Public Adjuster")
- COV_TYPE_DESC ("Coverage Type")
- COVERAGE A LIMIT
- COVERAGE B LIMIT
- DEDUCTIBLE_AMOUNT ("Deductible Amount")
- CHCK_AMOUNT ("Check Amount")
- CHECKNUMBER ("Check No.")
- ISSUEDATE ("Payment Date")
- STATUS_CD ("Check Status")
- PAY_RSN_TXT ("Payment Reason Text")

47.  █████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
████████████████████████████

---

[42] Plaintiffs' Motion for Class Certification, p. 19.
[43] ████████████████████████████████████

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

48. ███████████████████████████████████

49. ███████████████████████████████████

## VIII.  DETAILED FINDINGS AND ANALYSIS

### A.    *Plaintiffs' Claim*

50. The Plaintiffs' claim file was provided in .PDF files and included claim notes from the adjuster, Xactimate® estimates associated to the Plaintiffs' claim, email correspondence between the Plaintiffs and adjuster, photographs of the Plaintiffs' insured property, contractor agreements and quotes, among other documents.[44] Many of these documents are in imaged form, and may be handwritten, such that they had to be individually reviewed and

---

[44] TRUMBULL-GOBLE #000001-#001380, TRUMBULL-GOBLE# 001725-# 001728, and TRUMBULL-GOBLE 001729-001734.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

analyzed. Further, claim notes are freeform and had to be closely read to understand the claims process for the Plaintiffs' claim. In my experience reviewing structural property claim files, the process of associating, reconciling, and identifying each claim payment to the applicable Xactimate® estimate involves thoroughly reading the claim notes and often reviewing numerous pages of claim information since oftentimes a payment does not equal the RCV or ACV (net of the deductible) in the Xactimate® estimate. In those instances, a review of other information in the claim file is necessary to determine if the payment was for an estimated ACV, for actual repair costs, or for something else.

51. The Plaintiffs' claim file contained over 1,300 pages of information, and a thorough review was required in order to understand the circumstances of the Plaintiffs' claim and how each estimate was revised to account for changes in the estimates and the nature of the payments. As such, it took me 1 hour and 55 minutes to complete a thorough review of the Plaintiffs' claim file.

52. The Plaintiffs' claim file included four Xactimate® estimates due to changes in scope, cost changes, and other revisions. Through my review, which included reading 74 pages of adjuster claim notes, I was able to determine if each payment made by Trumbull to the Gobles was: i) an initial or supplemental ACV payment, ii) a partial RC payment, iii) a full RC payment,[45] or iv) another type of payment. ███████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████

53. The claim notes show that Trumbull sent an adjuster to inspect the home of the Gobles on September 11, 2019, five days after receiving the claim.[46] The first Xactimate® estimate in the claim file, which is dated September 13, 2019, showed an estimated RCV of $25,182.10, depreciation of $13,487.32, ACV of $11,694.78, deductible of $1,000, Net Claim of $10,694.78, and Net Claim if Depreciation is Recovered of $24,182.10.[47] The

---

[45] References in this report to claims where "full RC" was paid mean that the insured was paid for the full recoverable cost to complete all repairs *and* that for repairs paid on an ACV basis with non-material depreciation applied, the insured ultimately recovered *more* than that ACV amount.
[46] TRUMBULL-GOBLE #000064–#000137 at #000064 and #000074.
[47] TRUMBULL-GOBLE #000295–#000303.

EXPERT REPORT OF HEATHER L. ALBRIGHT - 26

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

face of the estimate does not break out how much of the depreciation was associated with materials (which Plaintiffs do not contest) versus non-materials (which Plaintiffs contend is improper).

| Summary for Dwelling | |
|---|---:|
| Line Item Total | 24,499.82 |
| Material Sales Tax | 682.28 |
| **Replacement Cost Value** | **$25,182.10** |
| Less Depreciation | (13,487.32) |
| **Actual Cash Value** | **$11,694.78** |
| Less Deductible | (1,000.00) |
| **Net Claim** | **$10,694.78** |
| Total Recoverable Depreciation | 13,487.32 |
| **Net Claim if Depreciation is Recovered** | **$24,182.10** |

54. A check was issued to the Plaintiffs, dated September 17, 2019, in the amount of $10,694.78 equal to the ACV (less deductible) that was calculated using Xactimate®.[48] For the Plaintiffs' claim, the first payment made by Trumbull was equal the estimated ACV (less deductible) in the first Xactimate® that was prepared. ███████████████████ ████████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████

55. Following the issuance of the initial check, the adjuster corresponded with the Gobles' selected roof contractor who indicated he was going to send a supplemental quote to adjust for specifications required by the Plaintiffs' homeowners association, include costs to repair a skylight on the roof, add general contractor overhead and profit, and make other adjustments.[49] Based on the claim file notes, while the supplemental estimate was being reviewed and reconciled, Trumbull received a copy of the signed contract from the

---

[48] TRUMBULL-GOBLE #001729.
[49] TRUMBULL-GOBLE #000064-#000137 at #000092-#000093.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

contractor on October 16, 2019.[50] ████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████ Following the receipt of the signed contract, Trumbull issued a check to the Gobles on the same day in the amount of $13,487.32, which was equal to the total depreciation that was applied to the original ACV payment.[51] As such, the Gobles had an ACV payment for less than thirty days, between when they were issued the ACV payment on September 17th, 2019 and when they were issued a check for full RC on October 16, 2019.

56.  A second Xactimate® estimate, dated October 25, 2019, was in the claim file which showed an estimated RCV of $35,484.94, depreciation of $15,263.04, ACV of $20,221.90, deductible of $1,000, prior payments of $19,221.90 and a Net Claim Remaining of $0.[52]

| Summary for Dwelling | |
|---|---:|
| Line Item Total | 28,751.94 |
| Material Sales Tax | 818.84 |
| Subtotal | 29,570.78 |
| Overhead | 2,957.08 |
| Profit | 2,957.08 |
| **Replacement Cost Value** | **$35,484.94** |
| Less Depreciation | (15,263.04) |
| **Actual Cash Value** | **$20,221.90** |
| Less Deductible | (1,000.00) |
| Less Prior Payment(s)      [Full Prior Payment(s) = 24,182.10] | (19,221.90) |
| **Net Claim Remaining** | **$0.00** |
| Total Depreciation | 15,263.04 |
| Less Residual Prior Payment(s) | (4,960.20) |
| Total Recoverable Depreciation | 10,302.84 |
| **Net Claim Remaining if Depreciation is Recovered** | **$10,302.84** |

---

[50] TRUMBULL-GOBLE #000064-#000137 at #000096.

[51] TRUMBULL-GOBLE #001730.

[52] TRUMBULL-GOBLE #000391-#000398. As indicated in the estimate, full prior payments to the Plaintiffs equal $24,182.10. The prior payments line item of $19,221.90 is a portion of the full prior payments to make the Net Claim Remaining equal to zero.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

57. As shown above, the second Xactimate® estimate calculated the Net Claim Remaining if Depreciation is Recovered equal to the total depreciation less the residual prior payments of $4,960.20, which is equal to the total prior payments of $24,182.10 less $19,221.90 which had been applied in calculating the Net Claim Remaining of $0. Trumbull issued a third check to the Gobles, dated October 28, 2019, in the amount of $10,302.84.[53] As such, no non-material depreciation was applied to the third payment issued and therefore the Plaintiffs were again sent a full RC payment.

58. Trumbull issued a fourth check to the Gobles on the same day in the amount of $1,000.[54] From the review of the claim file, I was able to determine this payment was a deductible refund as indicated in a letter, dated October 28, 2019, addressed to the Plaintiffs.[55] To perform this assessment and understand this history, I needed access to the claims file for the Gobles.

- Y86 DP 44486 : **DWELLING:**

  ○ Summary for Dwelling Supplement:$10,302.84
  Deductible Refund: $1,000.00○
  ○ **TOTAL DWELLING:** $11,302.84

---

[53] TRUMBULL-GOBLE #001731.
[54] TRUMBULL-GOBLE #001732.
[55] TRUMBULL-GOBLE #000415-#000425 at #000415.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

59. I further identified and reviewed the third Xactimate® estimate in the claim file, dated July 8, 2020, which showed an estimated RCV of $36,968.02, depreciation of $917.12, ACV of $36,050.90, prior payments of $34,484.94 ($10,694.78 + $13,487.32 + $10,302.84), and a Net Claim Remaining of $1,565.96.[56]

| Summary for Dwelling | |
|---|---|
| Line Item Total | 29,924.68 |
| Material Sales Tax | 881.98 |
| Subtotal | 30,806.66 |
| Overhead | 3,080.68 |
| Profit | 3,080.68 |
| Replacement Cost Value | $36,968.02 |
| Less Depreciation | (917.12) |
| Actual Cash Value | $36,050.90 |
| Less Prior Payment(s) | (34,484.94) |
| Net Claim Remaining | $1,565.96 |
| Total Recoverable Depreciation | 917.12 |
| Net Claim Remaining if Depreciation is Recovered | $2,483.08 |

As shown above, the third Xactimate® estimate found in the claim file calculated the Net Claim Remaining if Depreciation is Recovered of $2,483.08, which is equal to the total depreciation in this estimate plus the Net Claim Remaining. Per the claim notes dated June 25, 2020, the Plaintiffs hired an engineer who had determined that there was hail damage to thirteen windows (which was three more than was in the original Xactimate® estimate).[57] While the damage identified differed from the engineer hired by Trumbull, the adjuster accepted this and supplemented the Xactimate® estimate to include three additional windows.[58] The Plaintiffs received a fifth check, dated July 9, 2020, in the amount of $2,483.08.[59] As such, none of the depreciation that was included in the third estimate was withheld from the fifth payment received by the Plaintiffs, which again indicates that the Plaintiffs received another RC payment (with no non-material depreciation). This is also evidenced in a letter, dated July 9, 2020, addressed to the Plaintiffs and found in the claim file, which states that the payment is "the supplement of $1,565.96 and holdback

---

[56] TRUMBULL-GOBLE #000903-#000910.
[57] TRUMBULL-GOBLE #000064-#000137 at #000119.
[58] TRUMBULL-GOBLE #000120-#000124.
[59] TRUMBULL-GOBLE #001733.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

depreciation $917.12."[60]

> Dear JOHN M & PAULA A GOBLE:
>
> Enclosed is the updated estimate of your damages with regard to the above referenced claim.  Shortly you will receive a claim payment in the amount of $2,483.08.
>
> This amount reflects the supplement of $1,565.96 and holdback/depreciation of $917.12.

60. Based on my review of the Plaintiffs' claim file, I found what appears to be an error in this payment that resulted in an overpayment to the Gobles in the amount of $1,000. As shown above, in arriving at the payment, the estimate does not include the $1,000 deductible and it also does not include the refund of the deductible in the 'Less Prior Payment(s)' amount. As such, through July 9, 2020, the Plaintiffs received the following payments, which exceed the RCV equal to $36,968.02 in the most recent Xactimate® estimate, by $1,000.

| ISSUE DATE | CHCK AMOUNT | STATUS CD |
|---|---|---|
| 09/17/2019 | $10,694.78 | cleared |
| 10/16/2019 | $13,487.32 | cleared |
| 10/28/2019 | $10,302.84 | cleared |
| 10/28/2019 | $1,000.00 | cleared |
| 07/09/2020 | $2,483.08 | cleared |
| **Total** | **$37,968.02** | |

61. ████████████████████████████████████████████████████
    ███████████████████████████████████

62. I next identified and reviewed the fourth and final Xactimate® estimate in the claim file, dated August 12, 2020, which showed an estimated RCV of $43,231.50, depreciation of $4,218.79, ACV of $39,012.71, prior payments of $36,968.02 ($10,694.78 + $13,487.32 + $10,302.84 + $2,483.08), net claim remaining of $2,044.69, and Net Claim Remaining if Depreciation is Recovered of $6,263.48.[61]

---

[60] TRUMBULL-GOBLE #000917-#000925 at #000917.
[61] TRUMBULL-GOBLE #000936-#000944.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Summary for Dwelling | |
|---|---|
| Line Item Total | 34,754.97 |
| Material Sales Tax | 1,271.23 |
| Subtotal | 36,026.20 |
| Overhead | 3,602.65 |
| Profit | 3,602.65 |
| **Replacement Cost Value** | **$43,231.50** |
| Less Depreciation | (4,218.79) |
| **Actual Cash Value** | **$39,012.71** |
| Less Prior Payment(s) | (36,968.02) |
| **Net Claim Remaining** | **$2,044.69** |
| Total Recoverable Depreciation | 4,218.79 |
| **Net Claim Remaining if Depreciation is Recovered** | **$6,263.48** |

63. Per the claim notes, dated August 12, 2020, the adjuster supplemented the estimate to include labor and the material prices provided by Pella, Plaintiffs' window contractor.[62] In the claim files notes, dated August 17, 2020, the adjuster notes ACV of $39,012.71, prior payments of $37,968.02, and payment due of $5,263.48, which is notably $1,000 less than the amount reflected in the Xactimate® estimate and therefore corrected for the apparent overpayment.[63] The sixth check, issued on August 19, 2020, was in the amount of $5,263.48, which was equal to the figures in the adjuster notes and not what was in Xactimate® estimate.[64] As such, none of the depreciation that was included in the fourth estimate was withheld from the sixth payment received by the Plaintiffs, which represents a full RC payment.

64. This is also evidenced in a letter, dated August 17, 2020, addressed to the Plaintiffs in which the check amount is described as "the approved supplement amount plus the holdback depreciation originally withheld"[65] and a payment worksheet reflecting estimated remaining RC benefits of $4,218.79.[66]

---

[62] TRUMBULL-GOBLE #000064-#000137 at #000127-#000128.
[63] TRUMBULL-GOBLE #000064-#000137 at #000133.
[64] TRUMBULL-GOBLE #001734.
[65] TRUMBULL-GOBLE #000952-#000959 at #000952.
[66] TRUMBULL-GOBLE #001618-#001622 at #001619.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Dear JOHN M & PAULA A GOBLE:

Enclosed is the estimate of your damages with regard to the above referenced claim. Shortly you will receive a claim payment in the amount of $5,263.48.

This amount reflects the approved supplement amount plus the holdback/depreciation originally withheld.

65. Further, since the previous overpayment was corrected for by this sixth payment which was issued 41 days later, for that time period it appears that the Gobles had an excess of $1,000 in their possession. ███████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

66. As a result of my review of the claim file, I was able to fully understand the nature of the payments made to the Plaintiffs. Without a detailed review of the claims file materials, beyond the spreadsheets requested by Plaintiffs in discovery and available in the Extracted Data, I would not have been able to readily or accurately determine the nature of all six checks received by the Plaintiffs from the Extracted Data. ██████████████████████

███████████████████████████████████████████████████

████████████████████████

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

67. ██████████████████████████████████████████████
███████████████████████████████████████████████

EXPERT REPORT OF HEATHER L. ALBRIGHT - 33



This was confirmed by Sean Grinnan, property claim handler at Hartford Insurance Group, who testified, "I'm not aware of being able to tell just by looking at the payment if it was actual cash value or replacement cost value. I'd have to crosscheck with the notes."[68]

68. Based on my review of the claim file, I determined that Plaintiffs had an ACV payment, with non-material depreciation applied in the amount of $6,843.51, for a period of 29 days.[69] After this, all payments received by the Gobles were for full RC benefits or the refund of their deductible, and there was no depreciation withheld from any other payments, ████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ Finally, my review determined that for a period of 41 days it appears that the Gobles were overpaid by $1,000. ████████████████████████████████████████████████████████ ████████████████████████████████

69. Further, it is my understanding that as of the date of the Gobles' deposition testimony in September 2021, their windows had yet to be repaired despite receiving the full cost to complete the repairs.[70] Per the Gobles' homeowners policy, Trumbull will "pay no more

---

[67] ████████████████████

[68] Deposition of Sean Grinnan, dated December 1, 2022, p. 131:9:12

[69] The Plaintiffs' Motion for Class Certification (p. 6) asserts that Plaintiffs are owed $29.08 in prejudgment interest, which is calculated based on the non-material labor depreciation of $6,843.51 from the first estimate multiplied by a statutory rate of 5% and a period of withholding. The motion alleges the time period of withholding is 31 days from the first check dated September 17, 2019 through October 19, 2019. However, the second check received by the Plaintiffs was dated October 16, 2019, which is 29 days. If the Plaintiffs had used 29 days the prejudgment interest of $27.03. Further, as explained above, the Plaintiffs were overpaid by $1,000 for 41 days, from July 9, 2020 through August 19, 2020, and as such, if prejudgment interest were to be awarded, the interest of $5.60 may need to be considered as an offset.

[70] Deposition of John Goble dated September 3, 2021, p. 63:12-13 and Deposition of Paula Goble, dated September 18, 2021, p. 40:12-13 and pp.67:17-68:7.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

than the actual cash value of the damage until actual repair or replacement is complete."[71] Based on this policy language, I understand that Trumbull's position on this issue is that the Gobles have been paid more than is outlined in their policy since the window repairs have not been completed. Based on my review of the Gobles claim file, I determined that the last payment received by the Gobles, in the amount of $5,263.48, was a full RC payment that included depreciation of $4,218.79. ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ This amount far exceeds the prejudgment interest equal to $29.08 that was calculated for the Gobles' claim in Plaintiffs' Motion for Class Certification. That is, from a mathematical perspective, Plaintiffs' claim of interest resulting from the underpaid ACV from September to October 2019 is exceeded by the amount the Gobles received in RC payments for window work that they have not actually performed.

70. As I will discuss in the next section of my report, Mr. Johnson did not provide a methodology that could be applied to claims such as the Gobles, which included multiple Xactimate® estimates and multiple payments. He also did not address how he would adjust for potential errors that resulted in an overpayment to policyholders, and/or policyholders who accepted RC payments without having the repair work performed, and thereby received amounts in excess of the ACV payment. Presumably, this would be an offset to any economic harm that Plaintiffs are alleging was incurred by policyholders.

**B.    *Johnson's Report***

71. I reviewed Mr. Johnson's Report and opinions regarding whether objective information exists to determine if a given Trumbull policyholder can be identified as a class member under Plaintiffs' definition; and, if so, how long it would take to determine the amount and duration of time that non-material depreciation was withheld from a policyholder and

---

[71] TRUMBULL-GOBLE #000001-#000062 at #000027.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

interest that Plaintiff contends may be owed to some insureds.[72] Specifically, Mr. Johnson states, "there are only a select few data points needed to confirm if the claimant is a part of the defined group."[73]



Mr. Johnson further acknowledges that "for more complex claims, further data points are needed" to make his determinations. In addition, Mr. Johnson asserts that he can determine the amount and timing that non-material depreciation was withheld from a payment for "an average property claim within 2-3 minutes" with access to the .ESX file and access to the claims management software.[75]

72. 

73. Mr. Johnson offers no explanation or examples in his report for additional data points required to evaluate more complicated claims or how he would go about evaluating such claims. He also does not quantify how many "complex claims" there are within the Extracted Data. Therefore, in my opinion, Mr. Johnson has not shown that he could apply his approach accurately and reliably in a few minutes per file.

---

[72] Johnson Report, ¶¶ 3 and 6.
[73] Johnson Report, ¶ 44.
[74] ████
[75] Johnson Report, ¶ 52.
[76] ████████

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

74. Further, Mr. Johnson asserts that the "existence of an actual cash value payment" and "whether the insurance company is still withholding depreciation from the policyholder" are "objectively and easily determined facts."[77] Based on my experience reviewing estimates prepared using Xactimate® estimating software, and claims management software used by property insurance companies, this is not an accurate statement. One primary flaw in Mr. Johnson's opinion is that he assumes every payment made to a policyholder can be easily and clearly reconciled to a figure in the Xactimate® estimate ███████████████████ ████████████████████████ As I will demonstrate using examples below, this is often not the case.

75. When explaining the mechanics of how he would calculate the amount of non-material depreciation associated with claims, Mr. Johnson asserts that using the "current and workable Xactimate® .ESX file", he would toggle "the check-box in the depreciation boxes" and compare "the differences in the amounts of withheld deprecation."[78] Mr. Johnson does not provide an alternative way to calculate non-material depreciation using the Extracted Data, even though he indicates he could do so in his report.[79] Mr. Johnson's explanation also inherently assumes that the "current and workable" .ESX file was the basis for a payment to the policyholder. As discussed above in my review of the Gobles' claim file, Xactimate® estimates can include an amount for non-material deprecation even when the policyholder received a payment for full RC. As such, Mr. Johnson's proposed methodology would not be applicable to the Gobles' claim.

76. Mr. Johnson does not explain how he would gain access to the "current and workable Xactimate® .ESX file," and does not claim that he has access to such files for any persons other than the Gobles. I have not seen any .ESX files, aside from the Gobles, for purported class members in the materials I have reviewed. Further, Mr. Johnson has not considered the time necessary to locate and import the .ESX files for each claimant. Sean Grinnan says not all estimates are loaded on a computer and the "process of getting into Xactimate® can be timeless. If it's an older claim it has to download from the server again."[80]

---

[77] Johnson Report, ¶ 52.
[78] Johnson Report, ¶¶ 53-54.
[79] Johnson Report, ¶ 55.
[80] Deposition of Sean Grinnan dated December 1, 2022, p. 139:14-22.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

77. Mr. Johnson does not identify where he would obtain .ESX files for all class members, or how he would know which .ESX file to consider in assessing non-material depreciation, since, as discussed, estimates can show depreciation of some sort even when related payments did not have depreciation withheld. I have also seen deposition testimony in this matter confirming that Trumbull adjusters do not routinely track payments in Xactimate® and therefore are not using it for payment history.[81] Finally, Mr. Johnson's approach ignores the possibility that some insureds may have completed repairs to their property for less than the amount of their ACV payment(s), which does occur according to the testimony of Sean Grinnan.[82] In my professional experience, claim files very rarely contain repair documentation for insureds who did not submit claims for RCs, and understanding whether policyholders who had unclaimed RCs completed repairs will require obtaining records from the insureds and/or their contractors, and sometimes, inspecting the insureds' properties.

78. Mr. Johnson goes on to say that he would use the dates of the allegedly deficient claim payment or the date of the estimate (if a claim fell below the deductible) to determine the applicable dates of withholding needed to calculate interest allegedly owed.[83] He has not explained, however, how payments would be evaluated to reflect whether non-material depreciation was withheld or paid from that payment. Mr. Johnson claims that after he calculates the amount of withheld non-material depreciation and determines the dates of withholding, the "calculation of interest owed for the time value of the withheld non-material depreciation is a straightforward mathematical calculation that could be accomplished for all class members' claims through a single Excel spreadsheet containing the data…"[84] Mr. Johnson has not provided an accurate or reliable approach for calculating damages with respect to non-material depreciation or interest amounts, nor has he actually attempted to calculate these figures for a single claim in the Extracted Data. In my opinion, even if the amount of non-material depreciation withheld from a payment was easily determined, which it is not, the calculation of interest would be more involved than Mr. Johnson has claimed when the amount of non-material depreciation is changing over time. Because Mr. Johnson has not tested his approach for any claim, it is not possible to assess the accuracy or reliability

---

[81] Deposition of Sean Grinnan dated December 1, 2022, p. 112:7:10.
[82] Deposition of Sean Grinnan dated December 1, 2022, p. 154:18-155:4.
[83] Johnson Report, ¶ 57.
[84] Johnson Report, ¶ 58.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

of his approach, to identify an error rate, or to fully evaluate the time he claims it would require. Notably, regarding the calculation of interest owed, Mr. Johnson says the process is so mechanical it would add "merely seconds to the time required to review each individual claim file."[85]

79. The determination of whether any policyholder incurred any out-of-pocket costs as a result of Trumbull's application of depreciation on non-material costs cannot be made accurately by relying solely on the Extracted Data nor can it be made quickly using the Xactimate® .ESX files and claims management system as Mr. Johnson has proposed. The following points summarize the flaws with Mr. Johnson's approach:

   i.   Mr. Johnson did not address how he would accurately identify claims where the policyholder was paid the full replacement costs up-front and did not receive a payment with non-material depreciation applied or policyholders who received the applicable policy limit. Those policyholders would not be able to show any additional recoverable amounts under their policy or any out-of-pocket costs from their loss due to Trumbull's practice of depreciating non-material costs when making a payment based on the estimated ACV. ████████████████████████████ ██████████████████████████████ The fact that Xactimate® shows an amount of depreciation does not dictate whether particular claims payments did or did not pay for full repair costs, because actual payments amounts are not always based on the figure calculated using the Xactimate® estimating software.

   ii.  Mr. Johnson's approach assumes that all Xactimate® estimates prepared are used for a payment and that the Xactimate® estimates are always updated to reflect the most recent payment. Mr. Johnson's methodology further depends on the assumption that the first estimate created using Xactimate® was the basis for the first payment made to the policyholder. ██████████████████████████████ ██████████████████████████████ His approach therefore does not address the time-consuming effort of reconciling payments to estimates in order to determine the basis for each payment and whether the policyholder received a payment that included non-material depreciation. Based on my experience reviewing claims

---

[85] Johnson Report, ¶ 58.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

files and the data that can be extracted from the Xactimate® estimates and claims management software, Xactimate® estimates are sometimes created and not used as the basis for a payment. ████████████████████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

Furthermore, if the actual repair costs were different from the estimated repair costs and Xactimate® estimate was not updated to reflect the actual repair costs, which is not uncommon based on my experience, it would not be clear that the payments were for full RC and nothing further was owed on a claim. Situations could arise whereby claims payment data suggests an insured was underpaid based upon the RC amount listed in an estimate, but in actuality, the insured received the full cost to repair and it was simply less than originally estimated.

iii. If Trumbull's payment obligation is no more than the reasonable cost an insured has actually incurred for completed repairs, which I have been asked to assume, based on my review it is not possible to determine whether policyholders who received only an ACV payment, or otherwise had unclaimed RCs, completed repairs or were fully reimbursed for their incurred cost to repair without obtaining documentation or information that Trumbull does not have in its possession.

iv.  The examples set forth below, as well as the details from the Gobles' claim, illustrate why this is not true and why an individualized review of claim materials, and in some cases review of information that Trumbull does not have in its possession, is needed to understand how each claim was handled, whether each policyholder received an ACV payment with non-material depreciation applied, whether each policyholder incurred any out-of-pockets costs due to Trumbull's depreciation practice, and the amount and timing that non-material

---

[86] ████████████████████

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

depreciation was "withheld" for the claim either under Mr. Johnson's approach or any alternative view the Court may adopt.

80. ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████

       **i.**   **Mr. Johnson fails to provide a methodology that can be applied to "complex" claims with multiple estimates and/or multiple payments**

81. Mr. Johnson concedes that there are "more complex claims such as multi-payment claims that will require more time."[87] ██████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████ ███████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████

---

[87] Johnson Report, ¶ 56.

[88] ████████████████████████████████████████████████████

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



82.

83.

84.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

[REDACTED]

85.  Mr. Johnson does not provide an estimate of how much more time claims with multiple payments would him to review, but it would presumably take him much longer than 2-3 minutes. Moreover, Mr. Johnson does not appear to have built in any time for documenting the basis for his conclusions. [REDACTED]

86.  Further, Mr. Johnson indicates he would work with the "current and workable" .ESX file to toggle off the non-material depreciation boxes in order to determine the amount of non-material depreciation applied to a claim.[90] Mr. Johnson did not mention that he would have to work with multiple .ESX files for claims where the estimate, and the amount of non-material depreciation, changed over time, as it did with the Gobles. As previously noted, he also does not explain where and how he would receive the .ESX files for all estimates for all potential class members, and I did not see any reference to such files in the Plaintiffs' Class Certification materials.

87.  In summary, Mr. Johnson does not provide an explanation or methodology for how he would address the majority of the claims that would be considered for class membership.

**ii.  Mr. Johnson also fails to provide a methodology that can be applied to many claims with a single estimate and a single payment.  Further, his example**

---

[90] Johnson Report, ¶ 54.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**claims are not representative of the Gobles claim or the population of potential class members as a whole.**

88. Mr. Johnson has opined that "there are only a select few data points needed to confirm if the claimant is a part of the defined group".[91]



---

[91] Johnson Report, ¶ 44.
[92]
[93]
[94]

[95]

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



91.

92.

93.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

94. ███████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████████
██████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████████
███████████████████████████████████████████████████████
██████████████████████████████████████

95. In summary, Mr. Johnson oversimplifies the extensive review required to accurately identify and quantify policyholders who have non-material depreciation available for recovery at any point in time, and to determine the dates of withholding to calculate any interest owed.[96] Identifying reliable inputs needed to apply Mr. Johnson's approach will require individualized review of the claim file, including claim file notes, repair invoices, and contractor documents submitted by the insured, to arrive at the figures Mr. Johnson would then use for his calculations. █████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████████

---

[96] Johnson Report, ¶ 53.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

███████████████████████████████████████████████████████████████
███████████████████████████

### iii. Mr. Johnson fails to address limitations in the Extracted Data and other claim handling scenarios

96. While Mr. Johnson says "it is possible to determine the amount of withheld non-material depreciation and the applicable dates of withholding without direct access to the insurance company's claims management software"[97], he does not provide any explanations of how to analyze the Extracted Data or how to handle limitations observed within the Extracted Data. As explained in further detail below, I have observed limitations in the Extracted Data for which Mr. Johnson has not accounted for, as well as other scenarios that would require an individualized review of the claim file.

### a. Limitations of the Extracted Data

97. ██████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████████████
███████████████████████████████

98. ████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████████████

---

[97] Johnson Report, ¶ 55.
[98] ████████████████████████████
[99] ██████████████████

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

99.

100. Additionally, Plaintiffs' proposed class definition includes policyholders that either received an ACV payment or should have received an ACV payment "but for the withholding of non-material depreciation causing the loss to drop below the applicable deductible."[100]

---

[100] Plaintiffs' Motion for Class Certification, p. 1.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

██████████████████████████████████████████████████
████████████████████████████████

104. All of these limitations of the Extracted Data prevent it from being effectively used to systematically identify all policyholders that received a payment with non-material depreciation applied and the amount of any non-material depreciation that may still be remaining. This was corroborated by the testimony of Sean Grinnan who stated, "I'm not aware of being able to tell just by looking at the payment if it was actual cash value or replacement cost value. I'd have to crosscheck with the notes."[101] As such, an individual review of the claim files for many of the claims in the Extracted Data would be necessary to correctly identify the amount and timing of non-material depreciation that remained unpaid at any point in time.

**b. Claims with No Non-Material Depreciation ("RC Up-Front Claims")**

105. ██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
████████████

106. ██████████████████████████████████████████████
██████████████████████████████████████████████

---

[101] Deposition of Sean Grinnan dated December 1, 2022, p. 131:9-12.

EXPERT REPORT OF HEATHER L. ALBRIGHT - 50

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



107.

108.



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



109. ███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
██

110. ███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████

111. In my experience, claims similar to the examples above may have received an up-front replacement cost payment with no deduction for depreciation, but these claims cannot be accurately identified without an individualized review of each claim file. To date, Plaintiffs and Mr. Johnson have not to my knowledge presented any approach by which they could systematically prove which claims in the Extracted Data were paid up-front replacement cost benefits (or, conversely, claims where the policyholder received an ACV payment with non-material depreciation applied).

### c. Claims Where Estimated Repair Costs Are Overstated

112. ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████

113. For claims where the actual repair costs are less than the estimated repair costs, the policyholder would have received an overpayment of the depreciated value of the damaged property in their initial ACV payment. Mr. Johnson does not explain how, if at all, he would address any such overpayment when determining interest. For illustration, I present a hypothetical example:



|  | Estimated | | Actual | |
|---|---|---|---|---|
| Replacement Cost | $ | 1,000 | $ | 900 |
| Less Material Depreciation | | (100) | | (90) |
| Less Non-Material Depreciation | | (50) | | (45) |
| Actual Cash Value (pre-loss value) | $ | 850 | $ | 765 |

114. In this example (which for simplicity assumes no deductible), the policyholder received an ACV payment for the estimated pre-loss value of the property equal to $850, based on the estimated replacement cost of $1,000. After the ACV payment was issued, repair documentation was submitted showing the policyholder completed the repairs for $900 and an RC payment was issued for $50 ($900 RC less $850 ACV payment). The policyholder in this example received payment for the estimated pre-loss value of the property that was $85 higher ($850 less $765) than the actual pre-loss value of the property. Further, the amount of overpayment exceeds the non-material depreciation ($50) that was applied to the initial payment. Mr. Johnson did not make it clear in his report if he would calculate an interest payment on the non-material depreciation ($50) that was applied in calculating ACV. It is

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

unclear why interest would be due on an ACV payment that was overstated, which became apparent only after the actual replacement cost proved to be less than the estimated replacement cost.

115. ███████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████

███████████████████████

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████

116. ███████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████

## IX.  CONCLUSION

117. ███████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████ Contrary to Mr. Johnson's assertions, such
███████████████████████████████████████████

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

determinations would require a review of the individual claim file and supporting documents, at a minimum, which cannot be done in 2-3 minutes per claim. ████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

118. This report outlines the opinions I have formed to date in this matter. I hold the foregoing opinions to a reasonable degree of financial and data analytical certainty based on my education, professional experience, and review of materials specific to this case. If additional information is provided for my review, I reserve the right to revise and/or supplement these opinions.

Respectfully submitted,

_____
Heather L. Albright, CFE

# Heather Albright, CFE
Managing Director





**Chicago, IL USA**
**Office:** +1.312.237.4843
**Mobile:** +1.773.848.8634
halbright@stout.com

## Education

M.B.A, Accounting and Finance (2008)
Northwestern University

B.S., Finance (2001)
Indiana University

## Designations

Certified Fraud Examiner (CFE)

## Practice Areas

Investigations
Complex Business Litigation

## Practice Areas

Energy & Power
Financial Services
Healthcare
Government Agencies

Heather Albright is a Managing Director in the Disputes, Claims, & Investigations Group at Stout. She has 20 years of experience providing forensic accounting, consulting, and expert witness services for clients involved in litigation, investigations, or other challenging business conditions.

Ms. Albright's experience spans a wide range of industries including financial services, insurance, healthcare, and manufacturing. Her specialties include analyzing economic damages, class action defense, complex data analytics, fraud investigations, accounting and financial reporting issues, asset tracing, and other forensic analysis. Much of Ms. Albright's work has included the collection and analysis of extremely large data sets, which is often used for expert testimony.

Further, Ms. Albright has been deposed and testified as an expert witness in federal and state court and has assisted counsel throughout all phases of the litigation process. She has also provided operational consulting services to clients who wish to improve processes and internal controls.

Prior to joining Stout, Ms. Albright was a Director at Natoma Partners and a Director at Huron Consulting Group, a Manager at Sidley Austin LLP and a consultant at Arthur Andersen.

## Professional and Civic Memberships

- Association of Certified Fraud Examiners
- HFS Chicago Scholars - Board of Directors Executive Committee
- Big Careers Little Kids – Member
- Provisors - Member

**Exhibit 1**

**Heather Albright, CFE**
Managing Director



**Expert Report Submissions and Testimony  Experience (client in bold and underlined)**

Deposition and Expert Report in Re: Annie Arnold, individually and on behalf of all other Alabama residents similarly situated v. **State Farm Fire and Casualty Company**, Southern District of Alabama – Northern Division, Case No. 2:17-cv-00148-TFM-C (February 2019)

Expert Report in Re: James Stuart and Careda L. Hood, individually and on behalf of all others similarly situated v. **State Farm Fire and Casualty Company**, Western District of Arkansas – Texarkana Division, Case No. 4:14-cv-04001-SOH (September 2019)

Deposition and Expert Report in Re: Charles Cranfield, individually and on behalf of all other Ohio residents similarly situated v. **State Farm Fire and Casualty Company**, Northern District of Ohio – Eastern Division, Case No. 1:16-cv-001273 (April 2021)

Deposition and Expert Report in Re: Equinix, LLC v. **Digital Lakeside, LLC**, Circuit Court of Cook County, Illinois County Department, Chancery Division, Case No. 2019 CH 02475 (February 2022)

Testimony, Deposition, and Expert Report in Re:  Susan M. Valenti v. **Thomas P. Valenti, et al.**, Circuit Court of Cook County, Illinois County Department, Chancery Division, Case No. 2019 CH 09038 (December 2022)

Deposition and Expert Report in Re: **United States of America** v. Rutherford Tenants Corp. and James Ramadei, United States District Court Southern District of New York, Case No. 21 Civ. 10383, (April 2023)

Testimony and Expert Reports in Re: **BillFloat, Inc. dba SmartBiz Loans** v. Customers Bank, American Arbitration Association, Matter No. 01-22-0002-7416 (May 2023)

**Publications and Speaking Engagements**

"Developing Case Strategy and Approaches Regarding Complex and Data Intensive Financial/Litigation Matters," presented to Reed Smith LLP, November 10, 2016.

"Demystifying Data:  A Litigator's Guide to Understanding Data Analytics," Stout.com, October 3, 2018.

**Representative Experience: Forensic Investigations**

Engaged by counsel for an SEC registered securities broker-dealer ("defendant") accused of violating certain securities trading practices over a five-year period. The plaintiffs alleged that the defendant did not fulfill its duty of "best execution" as broker-dealer, by not executing orders promptly and executing proprietary trades for the specialists' own accounts ahead or instead of the plaintiffs' orders, in addition to handling orders in violation of the SEC diligence and priority rules. Work included the data collection, management and analysis of over 100 terabytes of data provided by two securities exchanges, the Options Price Reporting Authority (OPRA) and the plaintiffs' proprietary systems in order to identify exculpatory evidence.

Engaged by outside counsel for a company involved in a False Claims Act investigation. Led a forensic investigation into allegations that the company fraudulently sent duplicate healthcare claims to a government entity and was overpaid. Our work included analyzing healthcare claims in order to determine the amount and cause of any overpayment by the government. We were also tasked with investigating other errors in the company's claim

## Heather Albright, CFE
Managing Director



processing and creating improved controls. To analyze the claims we created a database to warehouse over five terabytes of claims data and a series of complex SQL code that compared claim attributes. The purpose of the analysis was to identify errors in claims processing and the cause of those errors to defend against False Claims Act allegations.

Provided forensic accounting services and complex data analytics for counsel who represented a former executive of a Futures Commissions Merchant ("FCM") accused of violating CFTC regulations relating to the safeguarding and investment of customer funds. Work included: 1) gaining an overall understanding of the FCM's systems and process used to generate and support the daily segregated and secured reports filed with the regulators; 2) retrieving, querying, and analyzing historical financial and operational data stored in over 200 SQL tables; 3) identifying transfers to and from customer segregated and secured accounts as well as transactions involving its broker dealer entity; and, 4) analyzing bank statement and general ledger detail as well as various operating records to identify the timing and magnitude of certain transactions. Our analysis was a core component of expert reports prepared by a retired FCM operations director and in connection with the cross examination of opposing experts.

Hired by investigative counsel of a live entertainment production company to investigate whistleblower allegations and alleged Foreign Corrupt Practices Act ("FCPA") violations. Work included the review and analysis of the Company's domestic and foreign banking and accounting records. Participated in numerous interviews of Company personnel, contractors and foreign officials, which were led by the investigators. We reviewed voluminous iterations of project budgets and transactional data and analyzed the project's overall net cash flows. In addition, we reviewed emails, recovered text messages and other related documents to understand the  internal discussions surrounding certain cash disbursements and events.

Supported an international rail operator with a dispute involving the exchange of rail traffic with another major rail operator in Latin America. Work included analyzing a database of all shipping records over a seven-year period, as well as examining various accounting records to determine the accuracy of both the client's payables and receivables. Also assisted the client in identifying control weaknesses with data collection and billing processes.

### Representative Experience: Economic Damages

Provided expert report and trial testimony concerning an opposing expert's damage calculation due to an alleged mismanagement of an investment portfolio and breach of fiduciary duty. Work included a detailed review of brokerage statements to evaluate account performance in comparison to market benchmarks.

Engaged by counsel to offer expert opinions in response to an opposing expert's economic damages calculation due to an alleged breach of contract involving the lease agreement for a data center. Work included a detailed review of company financial models evaluating project profitability and returns in addition to providing revised calculations of alleged damages.

Hired by counsel of a charitable organization to analyze economic damages resulting from fraudulent trading in the organization's investment account.  Work including analyzing trading records and account statements to measure account turnover ratios, cost-to-equity ratios, total fees and commissions, realized and unrealized gains and losses, and other measures in order to quantify damages.

**Exhibit 1**

# Heather Albright, CFE
Managing Director



---

Assisted with the preparation of an expert report to evaluate damages to an insurance broker resulting from a breach of non-solicit and non-compete terms of an employment contract. Work included a discounted cash flow analysis to quantify lost profit damages from departed customers and a lost merger opportunity.

Evaluated damages to a Fortune 100 chemical company arising from a leak of natural gas liquids at a storage facility and verified claims made by the other party to the litigation. Work included the recreation of company owned financial models to determine potential lost profits and a review of industry transactions to identify comparables for valuing storage.

## Representative Experience: Class Actions

Retained as an expert witness by counsel representing a large personal lines insurance company involved in several federal multi-state class action defense matters. Work included reviewing, mining, and analyzing information from hundreds of structural damage claim files in order to assess the commonality and typicality of the claims in response to plaintiffs' class action certification motions. Also provided background and context for the application of an accounting concept that was at issue in relation to the manner in which the claims were settled.

Provided litigation support for a Joint Defense Team of multiple pharmaceutical manufacturers related to class action litigation matters associated with pharmaceutical pricing and reimbursement issues. Work included extensive analysis of manufacturer, wholesaler, pharmacy benefit manager, provider and health insurance data involved in the distribution and reimbursement of pharmaceutical drugs.

## Representative Experience: Other Accounting and Financial Reporting Cases

Hired by outside counsel representing a district in a dispute with developers of oil and gas drilling sites regarding their valuation of depreciable property used for the payment of property taxes. Work included a detailed review of the developer's accounting records, chart of accounts and vendor invoices in order to determine if the correct labor and material costs were included in the cost basis of the property. Presented results of forensic analysis to the State Assessment Review Board.

Provided various financial and litigation consulting services to counsel of a leasing company in defense of a compensation dispute. Specifically, assisted with the calculation of the profit and loss related to various incentive compensation plans within the venture capital division and with the discovery process related to the claims.

Led a team in a multi-year engagement for a Fortune 500 U.S. truck manufacturer in the course of an accounting restatement. Assisted the restatement efforts to reconstruct and document the fixed assets accounting for a six-year period. The scope of the work covered all aspects of fixed assets accounting, including in-service dates, capitalized interest, and book and tax depreciation expense. Effort included the design and development of a SQL database tool to calculate the depreciation of all fixed assets over the restatement period.

---

**Confidential - Subject to Protective Order**

**John Goble and Paula Goble, et. al v Trumbull Insurance Company**                                                                                    **Exhibit 2**
**Case No. 2:20-cv-5577**
Documents Reviewed and Considered

| Document | Bates Range |
|---|---|
| First Amended Class Action Complaint with Jury Demand, dated October 29, 2021 | N/A |
| Defendant Trumbull Insurance Company's Answer to Plaintiffs' First Amended Complaint, dated November 12, 2021 | N/A |
| Plaintiffs' Motion for Class Certification, Appointment of Class Representatives and Appointment of Class Counsel, dated March 10, 2023 and accompanying exhibits | N/A |
| Defendant Trumbull's Insurance Company's Supplemental Answers, Objections, and Written Responses to Plaintiff's First Set of Document Requests and Interrogatories to Defendant, dated June 17, 2022 | N/A |
| Defendant Trumbull Insurance Company's Answers, Objections, and Written Responses to Plaintiffs' Second Set of Document Requests, Interrogatories, and Requests For Admissions, dated September 14, 2022 | N/A |
| Defendant Trumbull Insurance Company's Renewed Motion to Dismiss, dated November 12, 2021 | N/A |
| Plaintiffs' Response in Opposition to Defendant Trumbull Insurance Company's Motion to Dismiss (DKT. 39), dated December 30, 2021 and accompanying exhibits | N/A |
| Defendant Trumbull Insurance Company's Reply Brief In Support of its Renewed Motion to Dismiss, dated January 20, 2022 and accompanying exhibits | N/A |
| Deposition of Abigail Hengen, dated July 15, 2021 | N/A |
| Deposition of John Goble, dated September 3, 2021 and accompanying exhibits | N/A |
| Deposition of Paula Goble, dated September 18, 2021 and accompanying exhibits | N/A |
| Deposition of Sean Grinnan, dated December 1, 2022 and accompanying exhibits | N/A |
| Deposition of Kyle Smigala, dated December 19, 2022 and accompanying exhibits | N/A |
| Deposition of Jason Pawlik, dated January 10, 2023 and accompanying exhibits | N/A |
| .ESX Files for Plaintiffs' Xacimate Claim Files | TRUMBULL-GOBLE #001725-TRUMBULL-GOBLE #001728 |
| Hartford Xactimate® Extracted Data (Excel Spreadsheet) | TRUMBULL-GOBLE #005126 |
| ECOS Extracted Data (Excel Spreadsheet) | TRUMBULL-GOBLE #005127 |
| Plaintiff's Trumbull certified policy and claims file | TRUMBULL-GOBLE #000001-TRUMBULL-GOBLE #000062; TRUMBULL-GOBLE #000064-TRUMBULL-GOBLE #001380; TRUMBULL-GOBLE #001411-TRUMBULL-GOBLE #001445; TRUMBULL-GOBLE #001447-TRUMBULL-GOBLE #001724; TRUMBULL-GOBLE #001729-TRUMBULL-GOBLE #001734 |